UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JACQUELINE B. MARTINEZ,           )
                                  )
                    Plaintiff,    )
                                  )
        v.                        )        CV-02-1106
                                  )
RAPIDIGM, INC.,                   )
                                  )
                    Defendant.    )

<u>MEMORANDUM ORDER</u>

CONTI, District Judge

In this memorandum order, the court considers the motion for summary judgment (Doc. No. 204) filed by defendant Rapidigm, Inc. ("defendant" or "Rapidigm") with respect to all claims against defendant asserted by plaintiff Jacqueline B. Martinez ("Martinez" or "plaintiff"). Defendant, which is in the business of providing information technology consulting services (Answer, Doc. 4 ¶ 5), hired plaintiff, an attorney, as director of immigration services in October 1998 and terminated her employment effective August 1, 2001. (Joint Statement of Material Facts ("JSMF"), Doc. No. 223 ¶¶ 1, 45).

Plaintiff asserts three claims in her complaint: (1) count I, sex discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2 <u>et</u> <u>seq</u>. ("Title VII"); (2) count II, sex discrimination and retaliation claims under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §§ 951 <u>et</u> <u>seq</u>.("PHRA"); and (3) count III, wrongful discharge claim under state law. Defendant moves for summary judgment with respect to all those claims. The undisputed material

1

facts and the disputed facts viewed in the light favorable to plaintiff do not provide a
basis for a reasonable trier of fact to return a verdict in favor of plaintiff.  The court will
therefore grant summary judgment in favor of defendant as to all claims for the reasons
stated below.

### Factual Background

The factual background is derived from the undisputed evidence of record and the
disputed evidence of record viewed in the light most favorable to the nonmoving party.
See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the
nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### I.  Plaintiff's Workplace Environment

At the time plaintiff was hired in October 1998, she received a copy of the
employee handbook containing defendant's "Sexual and Other Unlawful Harassment"
policy.  (JSMF ¶ 30).  On January 31, 2000, plaintiff was reprimanded for playing a
practical joke on a male colleague.  (Martinez Dep., October 8, 2003 at 266).  Plaintiff
had placed her colleague's picture on an internet dating site, and in the weeks following
the posting, around the end of January 2000, plaintiff distributed to other employees
emails with links to the website.  (Id. at 260-65).  After the colleague reported the
incident to defendant's director of human resources, Colleen Sullivan ("Sullivan"),
defendant's chief executive officer,  Lew Wheeler ("Wheeler") reprimanded plaintiff not
only for misusing the company's time and facilities, but also for disseminating an
embarrassing and defamatory email.  (Id. at 268).

On September 8, 2000, Sullivan reprimanded plaintiff about a sexual comment that plaintiff publicly made to a subordinate.  Rapidigm used in-house recruiters to recruit information technology professionals, called "consultants" and  many of whom are foreign nationals,  for outside placement.  (Pl.'s Compl. ¶¶ 5, 10, 11, Def.'s Answer ¶¶ 5, 10, 11).  In this instance, plaintiff had suggested to her subordinate that the subordinate ought not to run to deliver papers to a recruiter, rather to let him retrieve them, lest the recruiter think that the next time, the subordinate would "come up there and do lap dances for him."  (JSMF ¶ 29).  Plaintiff, who had served as a designated equal employment opportunity contact, acknowledged making the comment and noted its inappropriateness.  (JSMF ¶ 30).

On September 29, 2000, plaintiff complained to Sullivan about two off-color comments by another employee, Mark Faurie ("Faurie"), with respect to plaintiff's wearing a sleeveless shirt ("I see you are enforcing your 2nd amendment rights . . . the right to bare arms"), and to plaintiff and another woman employee who had declared that she was tired ("If I had known we would be hiring such good looking women, I would have kept the couch [in my office].").  Again, Sullivan investigated and Faurie was reprimanded, though apparently the comments offended no one, including plaintiff. (JSMF ¶¶ 32, 33).

Inappropriate comments of a sexual nature were somewhat commonplace at Rapidigm.  (JSMF ¶ 141).  Plaintiff testified that the comments "were sexually harassing, some yes, some no."  (JSMF ¶ 141).  For example, another employee complained to plaintiff about sexually derogatory language, foul language, and obscenities used by men

in marketing, the marketing area of the office having been dubbed within Rapidigm as the "shark tank." (JSMF ¶ 135). Sullivan had heard of the "shark tank." When plaintiff, however, reported the "shark tank" problem, Wheeler's response implied that the complainer was ultra-sensitive. (JSMF ¶¶ 136, 137). During the remainder of plaintiff's employment with Rapidigm, she did not file any other reports of sexual harassment or inappropriate conduct of a sexual nature. (JSMF ¶ 143).

During her tenure at Rapidigm, plaintiff herself contributed to an atmosphere in which sexual comments and blunt language were, to an extent, commonplace. She used words like "bitch" to describe herself in emails, apparently in a favorable manner. (JSMF ¶ 63). The record is replete with email correspondence plaintiff sent both to female and male colleagues within the company, containing sexually explicit, obscene, and shocking cartoons, photographs, jokes, and narratives. (Exhibits 32, 33, 34 and 35 to Martinez Dep., October 8 and 9, 2003). Notably, some of this email correspondence was directed to the very individuals against whom plaintiff lodged sexual harassment complaints. (Ex. 33 to Martinez Dep., October 8 and 9, 2003).

## II. Plaintiff's Gender Bias Allegations

Plaintiff believed that at Rapidigm she was not taken seriously as a professional because she was a woman. (JSMF ¶¶ 18, 116). Perceived cultural differences with some Indian colleagues apparently played a part. Wheeler told plaintiff, using broad-brush language, that India "didn't allow the women to assert themselves and to use their brain power." (JSMF ¶¶ 18). Although plaintiff, an attorney, was a director with responsibility for the immigration department, she was told by several recruiters that

4

opposition to her (as opposed to John Tatalovich ("Tatalovich") who had previously handled plaintiff's work as an outside contractor) was due to her being a woman. (Id.) Recruiters told plaintiff that she would be in the position of giving them directions, they were used to doing whatever they wanted, and "it's even worse when a woman tells you." (Id.)  After helping one of Rapidigm's foreign national consultants, Raj Chandra ( "Chandra"),  obtain his citizenship so he could bring his wife to the United States from India, plaintiff expressed interest in meeting the consultant's wife.  Chandra replied: "No.  I'm not going to let you ever meet her, you're not the kind of woman that I want my wife to meet, you're going to put new thoughts into her head.  I don't want my Indian wife to become Americanized.  I want her to stay Indian." (Id.)

       In addition to specific comments such as these, plaintiff notes that the manner in which defendant handled sexual harassment complaints from her, a woman, differed from the way in which sexual harassment complaints from men were treated within Rapidigm.  For example, in September 2000, plaintiff formally complained to Sullivan about a comment made by Rapidigm's chief operating officer, Ravi Amble ("Amble"). When Amble said, in response to plaintiff's refusal to sign H1-B petitions, "Who do you think you are, the Queen?," Sullivan neither conducted an investigation nor discussed the complaint with plaintiff.  Sullivan did not discuss that comment with Amble because Sullivan did not consider the statement to be sexist.  (JSMF ¶ 124).  In contrast, when Sullivan had learned that same month of plaintiff's "lap dance" comment, Sullivan talked with the accuser but did not discuss the matter directly with plaintiff.  Sullivan followed-up with a critical email to plaintiff about the prohibited activity, but Sullivan testified later that she did not consider the warning email to plaintiff about the "lap dance" to be a

serious action.  (JSMF ¶ 124.)  When investigating plaintiff's complaints about Faurie's comments at the end of September 2000, Sullivan spoke directly to Faurie, making no attempt to talk to plaintiff; the comments, however, had offended no one, including plaintiff.  (JSMF ¶¶ 32, 33).

### III. Plaintiff's Efforts to Ensure Compliance

Wheeler hired plaintiff to serve as Rapidigm's director of immigration services. Another woman, Debra Kurth ("Kurth"), was hired at about the same time to serve as general counsel for non-immigration legal matters.  (JSMF ¶ 1).  At the time defendant hired plaintiff, defendant had immigration-related legal compliance problems; at least as early as November 1998, plaintiff believed that defendant intended to come into compliance.  (JSMF ¶ 2).  Indeed, Wheeler testified that Rapidigm's immigration department, headed by plaintiff, could spend whatever was needed, and use outside counsel, to bring the company into compliance.  (JSMF ¶ 3).  By March 1999, plaintiff had been told that she was to do what was required to make sure defendant was in legal compliance.  ( JSMF ¶ 4).

Rapidigm, in order to place its consultants, the foreign information technology professionals, submitted to the Immigration and Naturalization Service ("INS")[1] petitions on its consultants' behalf for non-immigrant visas ("H-1B").  For a foreign national to be

---

[1]As of March 1, 2003, the INS was eliminated as an independent agency within the United States Department of Justice, and its duties regarding applications for immigration benefits were assumed by the CIS in the United States Department of Homeland Security. See Homeland Security Act of 2002, Pub.L. 107-296, § 471(a), 116 Stat. 2135, 2205 (Nov. 25, 2002); 68 Fed.Reg. 10922-01 (Mar. 6, 2003).

eligible for an H-1B visa, the duties of the position must meet the "specialty occupation" requirements of sections 101(a)(15)(H)(i)(b) and 214(i)(1) of the Immigration and Nationality Act of 1952 ("INA"), <u>as amended</u>, 8 U.S.C. §§ 1101(a)(15)(H)(i)(b) and 1184(i)(1).   Part of the process involved filing a Labor Condition Application ("L.C.A.") with the U. S. Department of Labor attesting to the conditions of employment, including the employer's name and the job location.  Beginning about October 1999, plaintiff told the human resources department at Rapidigm that she wanted to bring much of the H-1B process in-house so that she could ensure that the process was legally compliant.  ( JSMF ¶ 5).

At Wheeler's request, in December 1999, plaintiff wrote a formal memorandum reviewing for defendant the H-1 B program, the applicable laws, the status quo at that time, including a description of what was not then in compliance and outlining possible remedies.  (JSMF ¶ 6).  In her discussions with defendant, plaintiff insisted that she would not take over the H-1B program "unless [she had] 100% commitment and effort in moving into compliance."  (JSMF ¶ 7).  Plaintiff recommended that defendant hire experienced outside counsel, which defendant did.  (JSMF ¶ 7).  In March 2000, plaintiff assumed responsibility for all aspects of the H-1B program, at which time she did not believe she had an ethical duty to report any lapses to the government.  (JSMF ¶ 8).

From March through August 2000, plaintiff communicated to recruiters and defendant's executives that the immigration cases were being processed speedily, timely, and by August 2000, in compliance with the law.  She reaffirmed her commitment to keeping defendant "above board with respect to all compliance issues," and attributed her success to her "tremendous amount of effort and personal investment."  (JSMF ¶¶ 9-11,

16).

One of several solutions plaintiff proposed to defendant was a "homebasing" program. (JSMF¶ 13). Though the L.C.A. required by the Department of Labor requires specificity regarding the employee's job location, in about 60 percent of cases, a candidate may not know that location until one week before the placement. (JSMF¶ 12). Under homebasing, prospective employees initially would be assigned to one of several central bases from which they could later move. (JSMF¶ 14). The L.C.A. could later be amended or refiled with the correct information. (JSMF¶ 15). Plaintiff was implementing this program but by August 2000, had not fully implemented it. (JSMF¶ 16).

Also in August 2000, defendant and plaintiff, who had been working seven days a week, agreed that someone with H-1B experience should be brought in to assist. (JSMF ¶17). Wheeler perceived that the consultants and recruiters had been unhappy with the responsiveness of the HB-1 section up to that point and felt they were being rudely treated. (JSMF ¶ 18). Defendant selected Tatalovich for the position based upon his perceived responsiveness and good relationships with consultants. (JSMF ¶ 18). Tatalovich was the same individual whose firm, Global Strategies, had previously handled the defendant's immigration work and who had opposed defendant's bringing the H-1B program in-house. (Martinez Dep. October 8 at 97-98). Plaintiff opposed Tatalovich's hire because she believed he was someone who had "created such crises for this company" and because she did not believe that he was attentive to regulations, maintaining compliance, and maintaining paperwork. (JSMF ¶ 18). Plaintiff believed that because of this opposition, and the later split between the HB-1 section and the

8

Green Card section through which Rapidigm helped its alien consultants obtain

employment-based permanent residency, she became a "persona non grata" with

Wheeler, others in management at Rapidigm and the recruiters.  (JSMF ¶ 63).

### IV. Plaintiff's Withdrawal from Responsibility for the H-1B Program

Indirectly, plaintiff learned that defendant would not be implementing her

proposed homebasing program.  (JSMF ¶¶ 20, 21).  In light of that understanding and

because plaintiff felt that she could not rely upon what recruiters might tell her about

consultant locations, among other reasons, plaintiff informed defendant on September 1,

2000, that she would not sign any more H-1B petitions.  (JSMF ¶ 21).  Without prior

approval from defendant, plaintiff informed defendant's recruiters and human resources

department, in an email,  that she was separating herself and her staff from the H-1B

program, and sent copies of the email to Wheeler, Amble, and Rapidigm's president,

Paul Freudenberg ("Freudenberg").  (JSMF ¶ 22).

Kurth, the general counsel, did not understand why plaintiff withdrew, as it

appeared to Kurth that all was proceeding well, with no greater likelihood of legal non-

compliance.  (JSMF ¶ 23).  Wheeler and Freudenberg advised plaintiff that she need not

sign anything with which she was uncomfortable, and Wheeler offered to sign the

petitions himself.  Amble, however,  insisted that plaintiff sign petitions until Tatalovich

began his employment.  (JSMF ¶ 24).  Amble told plaintiff that he viewed her refusal to

sign the petitions as "insubordination" and asked "Who do you think you are . . . the

Queen?"  Amble told her that he would speak to Wheeler and that repercussions would

follow.  (JSMF ¶ 25).

## V.  Plaintiff's Warnings to Report Non-Compliance

Plaintiff told Amble on September 1, 2000, the date on which she ceased signing the petitions, that if she "found out or came to learn that there was some fraud and there were fraudulent petitions, that [she] would have a legal duty to report that."  (JSMF ¶ 27).  On that date, plaintiff had not looked at pending petitions to assess their accuracy, nor did she know the compliance status of the overall program.  (JSMF ¶ 26).  Plaintiff was not again asked to sign these petitions on defendant's behalf.  (JSMF ¶ 28).  Indeed, from then on, the HB-1 and Green Card sections operated separately; plaintiff instructed her Green Card staff not to communicate with the HB-1 staff, the staffs maintained separate work areas, files and supplies, and her staff refrained from obtaining information directly from the HB-1 files or staff.  Her staff obtained information directly from the consultants.  (JSMF ¶ 34).  Plaintiff took pains to insulate herself from the H-1B process, even declining to answer related questions or to discuss related topics; her position was premised on her conviction that if she discovered that things were wrong, she would have a duty to report.  (JSMF ¶ 35).  Plaintiff testified that she might have sent an email to that effect in November 2000 to Kurth and Wheeler explaining that she "did not want to [participate in the H-1B program] because if [she] found out things were ongoing wrong, then [she] would have to report. . . ."  (JSMF ¶ 36).

By February 2001, defendant concluded that the immigration department at Rapidigm was not effectively working and brought in Larry Lebowitz  ("Lebowitz"), an attorney with the Cohen & Grigsby law firm, to perform an audit.  (JSMF ¶¶ 37-38).  Lebowitz's evaluation noted that if the "current barriers and obvious tension between

[the H and Green Card] groups continue, the level/quality of service will drop and the company as a whole will suffer." (JSMF ¶ 39). In May 2001, defendant issued a Request for Proposal ("RFP") to Pittsburgh area immigration attorneys to determine whether defendant's immigration program should be outsourced, or, in the alternative, whether other means could be found which would result in a well-run immigration department. (JSMF ¶ 40). One Pittsburgh firm declined to bid and another submitted a plan which was too expensive. A third firm, Reed Smith, L.L.P. ("Reed Smith"), proposed that rather than outsourcing, defendant reorganize under Reed Smith's guidance, first, the Green Card section and then, the H-B1 section. (JSMF ¶¶ 41, 42). Reed Smith was retained in July 2001 to implement this reorganization proposal, which by its nature, would obviate the need for plaintiff's position as well as several other positions within Rapidigm. (JSMF ¶¶ 43, 44).

## VI. Plaintiff's Discharge from Employment

Wheeler and others at Rapidigm testified that shortly after Reed Smith's retention, defendant decided to eliminate plaintiff's position and effective August 1, 2001, plaintiff was terminated. At the same time, on Reed Smith's recommendation, three other employees were also terminated either because Reed Smith assumed the work related to those positions or because the positions themselves were redundant under the new organizational plan. (JSMF ¶ 45, 46). Additionally, a number of other immigration department staff elected to leave, including Tatalovich, and their positions were not filled. (JSMF ¶¶ 46, 47, 48). Reed Smith made numerous operational recommendations, all of which defendant adopted, and finally, Reed Smith recommended that defendant

hire an immigration department director.  (JSMF¶¶ 49, 50).

Nine months passed between the time plaintiff complained about Amble and Faurie and refused to sign the petitions and the time she was terminated.  (Pl.'s Br. at 19).

Defendant hired Julie Shymansky ("Shymansky") as director of operations, immigration services, effective October 2001.  (JSMF¶ 51).  In this position, Shymansky served as liaison with outside counsel, in house-attorneys and staff.  Shymansky made recommendations regarding compliance, but did not file petitions.  (JSMF¶ 53).

### VII. Plaintiff's Actions to Report Non-Compliance

Throughout her employment, plaintiff remained attentive to compliance issues at defendant and had mentioned three times to defendant following her March 2000 announcement of full-compliance that, under certain circumstances, she might have to report defendant to an outside entity.  (JSMF¶ 55).  Again, upon termination, plaintiff advised that "if I find out that any of my work has been used to perpetrate a fraud that I would have to report and that a lot of people could be involved in any kind of report that's made."  (JSMF¶ 56).  As of the date of her termination, however, plaintiff had not uncovered non-compliance for which she felt she would have been responsible, though prior to plaintiff assuming full responsibility for the H-1B program, an audit did uncover irregularities. (JSMF¶ 57).  In keeping with her stated principles, during her employment with defendant, plaintiff acknowledged that she never did anything she believed to be unlawful or unethical, never signed any document knowing that the information therein was inaccurate, never engaged in fraud or anything unlawful, and never reported any compliance issues to an outside entity.  (JSMF¶¶ 58-61)

12

Two months following plaintiff's termination, and not in response to any new information, plaintiff reported to the Department of Labor and the INS that defendant was in violation of the law.  (JSMF¶ 62, Martinez Dep., October 9, 2003 at 606-14). When asked at her deposition what triggered her to make the formal complaint following her termination, plaintiff testified:

> I mean the whole time I was at Rapidigm.  I mean, it was basically a –
> should I, you know, I don't want to report them, but if I have to, I will
> report them.  If I see any kind of information that comes across my way,
> I'm obligated to report them.

(Martinez Dep., October 9, 2003 at 606).

## Standard of Review

Summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PRO. 56(C.)  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).   In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.   The court may consider any material or evidence that would be admissible or

usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1 Cir.1993) ( citing WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J.1956), aff'd, 248 F.2d 543 (3d Cir.1957), cert. denied, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or *otherwise made admissible in evidence."* ) (emphasis added).

### *Analysis*

Defendant moves for summary judgment on all of plaintiff's claims.  The discrimination and retaliation claims under Title VII and the PHRA claim will be discussed first, and the state wrongful discharge claim will be discussed last.  The discrimination claims are based upon gender discrimination, hostile work environment and disparate treatment, each of which will be specifically addressed.

### I. Discrimination Claims

#### *A. Gender Discrimination*

In her complaint, plaintiff asserts claims of gender discrimination based upon both Title VII (count I) and the PHRA (count II).  The analysis required for adjudicating plaintiff's claim under the PHRA being identical to a Title VII inquiry,  Goosby v. Johnson & Johnson Medical, 228 F.3d 313 (3d Cir. 2000),  this court will not separately address her claim under the PHRA.

Title VII prohibits discrimination in employment based upon gender.  See 42

U.S.C. § 2000e-2 (2004).  A plaintiff may establish a claim of gender discrimination based upon indirect evidence of discrimination, pursuant to the three-tiered, burden shifting framework set forth in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1987). See Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000) (applying the McDonnell Douglas burden-shifting framework to Title VII claims).

McDonnell Douglas sets forth a three-step process in examining claims of discrimination.  Id.  First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff can establish a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Upon the defendant's satisfaction of this burden, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the articulated reason is a pretext for a discriminatory motive.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  To defeat a motion for summary judgment on the basis that the employer's proffered explanation is a pretext for actual discrimination, "the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994).

### 1. Prima Facie Case of Discrimination

To establish a prima facie case of gender discrimination under Title VII, a plaintiff must show that she: (1) belonged to a protected class; (2) was qualified for the

position in question; (3) was terminated; and (4) persons not in the protected class were retained.  See In re Carnegie Associates, 129 F.3d 290, 294-95 (3d Cir.1997); see also Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 2002).  Plaintiff, at the summary judgment stage, neglects to address these four points.  Viewing the facts of record in their totality, and in a light most favorable to plaintiff for purposes of summary judgment,  this court concludes that plaintiff could make out a prima facie case:  as a woman, she belonged to a protected class; she was qualified for the position she held, both when hired and at the time of defendant's reorganization; and some men, persons not in the protected class, were retained.

### 2. Legitimate, Nondiscriminatory Reason

The second prong of the McDonnell Douglas analysis requires that the defendant articulate a legitimate, nondiscriminatory reason for its employment action against the plaintiff.  In order to satisfy its burden of production, a defendant need only introduce evidence that, if taken to be true, would permit the conclusion that the reason for the adverse employment action was nondiscriminatory.  Fuentes, 32 F.3d at 763.

Here, defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's termination.  Defendant proffered that it terminated plaintiff's employment as part of a reorganization of the entire immigration department after months of analysis and based upon the June 2001 recommendation of an outside audit.  By February 2001, defendant's management had been concerned that the bifurcation in the immigration department was leading to various compliance, service, and cost concerns, and began an outside evaluation of the business operations by engaging Lebowitz.  Lebowitz

concluded that the barriers and tensions between the H and Green Card sections of the immigration department would ultimately lead to a drop in service, damaging the company.  In May 2001, Rapidigm disseminated an RFP to outsource the immigration department, which the court notes would have eliminated plaintiff's position even earlier than her termination date.  Defendant ultimately accepted a June 2001 Reed Smith proposal for an immigration department reorganization.  Both sides agree that there was a history of both policy and personality discord within the immigration department, some predating, but certainly after, Tatalovich's hiring.  This known conflict lends credence to Rapidigm's decision to seek outside guidance, and also to follow that guidance, once a satisfactory solution was agreed upon.

Title VII is not a vehicle for second guessing business decisions. See Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 527 ("[b]arring discrimination, a company has the right to make business judgments on employee status.).  Competent employees often are terminated as part of a reorganization.  This court concludes that defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's termination.

### 3. Pretext for Gender Discrimination

Under the third and final prong of the McDonnell Douglas analysis needed to defeat defendant's motion for summary judgment with respect to her gender discrimination claim, plaintiff must point to record evidence creating a genuine issue with respect to a material fact for a reasonable fact finder to resolve.  That is, plaintiff must adduce sufficient evidence for a reasonable fact finder to conclude that defendant's articulated reason was a pretext, masking a discriminatory motive.  See Fuentes, 32 F.3d

17

at 764.  Plaintiff must show "such weaknesses, implausibilities, inconsistencies . . . or contradictions in [the defendant's] proffered legitimate reason [such] that a reasonable factfinder could rationally find them unworthy of credence."  Id. at 765.

Controlling precedent in this circuit allows a plaintiff to satisfy this prong by pointing to some evidence "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Id. at 764.  With respect to this approach, the United States Court of Appeals for the Third Circuit stated: "To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a fact finder could conclude by a preponderance of the evidence that [a protected characteristic] was a motivating or determinative factor in the employment decision."  Simpson v. Kay Jewelers, 142 F.3d 639, 644- 45 (3d Cir. 1998).

Plaintiff alleges in her complaint that she was terminated because she complained about inappropriate comments made by a man and failed to exhibit stereotypical female characteristics such as subservience.  At this stage, plaintiff fails to link the discharge to gender.  This court concludes that plaintiff has not satisfied the burden of demonstrating that there is a genuine issue as to a material fact for a fact finder to resolve on the question whether defendant's proffered explanation for terminating plaintiff is a pretext.

Granting plaintiff all favorable inferences, the evidence relevant to plaintiff's Title VII and PHRA claims and suggesting that the reorganization was a pretext for discrimination is scant.  Plaintiff contends, in her brief, that the following facts demonstrate that the reorganization was a sham:  1) the alleged "reorganization never

occurred and Martinez's position was never eliminated," but rather was filled by Shymansky; 2) Rapidigm went on a "fishing expedition" to outside immigration attorneys to provide "cover" for its desire to eliminate plaintiff, that is with the goal of securing the recommendation that plaintiff's position be eliminated; 3) the other terminated employees were "supporters" of plaintiff; and, 4) Amble testified that Rapidigm did not know on the day plaintiff was terminated what it would do about the work she had been performing.

Plaintiff's allegation in her brief that the alleged "reorganization never occurred and Martinez's position was never eliminated," but rather filled by Shymansky is illogical in light of the undisputed evidence of record and is thus insufficient to create a genuine issue as to a material fact for a fact finder to resolve.  Prior to defendant's termination on August 1, 2001, her position with the company was oversight of the immigration department's Green Card section.  Although plaintiff argues that her position was never eliminated and that the company always had someone in plaintiff's position performing the same duties, the record belies these assertions.  At the time of her termination, plaintiff had not been director of the entire immigration department overseeing all immigration related matters since September 2000 when she separated herself from the H-1B process.  The position she held, with hands-on responsibility for the Green Card section, was eliminated under the reorganization, just as three other employees' positions were eliminated, and they too, were terminated the day following plaintiff's termination.

As part of the reorganization, several other individuals were also terminated or resigned.  Certain positions of both men and women were eliminated as part of the restructuring, while other positions held by men and women were retained within the reorganized company.  The general counsel – Kurth, also a woman – whom Wheeler hired at the same time as plaintiff was not only retained, but was involved with and concurred in the reorganization.  In October 2001, upon Reed Smith's recommendation, defendant hired Shymansky, a woman, to run the combined immigration department.  Of course, the retention of one woman and the hiring of another woman do not in themselves negate the existence of  gender discrimination; these circumstances, however, do lend credence to the legitimacy of defendant's reorganization and necessitate a response by plaintiff.  Plaintiff contends that Shymansky's gender is irrelevant.  See Pivirotto v. Innovative Sys., 191 F.3d 344, 354 (3d Cir. 1999)( "The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a plaintiff in this situation to counter (or explain) such evidence.  But this fact [is not conclusive].")

Plaintiff next asserts that defendant went on what this court might characterize as a "fishing expedition" to outside immigration attorneys to provide cover for its desire to eliminate plaintiff, with the goal of securing the recommendation that plaintiff's position be eliminated.  Evidence of this, according to plaintiff, is defendant's not sharing with her the outcome of Lebowitz's audit; that defendant failed to follow Lebowitz's recommendation that no one be fired; and that defendant acted on the advice of another outside auditor which did recommend the elimination of plaintiff's position.  Each of

these points challenges a legitimate business decision defendant was free to make, and none are probative of the "fishing expedition" theory.

Plaintiff's remaining two reasons, that the other terminated employees were "supporters" of plaintiff and that Amble testified that defendant did not know on the day plaintiff was terminated what it would do about the work she had been performing, also do not raise a genuine issue of material fact regarding pretext.  No reasonable jury could accept that defendant would undertake a costly, months-long audit by outside experts (not challenged by plaintiff as to their competence or truthfulness) solely to arrive at the result of terminating plaintiff.  Plaintiff bears the burden to "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision."  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).  These factual assertions by plaintiff are insufficient to create a genuine issue with respect to a material fact regarding whether defendant's  proffered explanation for plaintiff's termination should be disbelieved, or with respect to whether unlawful gender discrimination motivated defendant's decision to terminate plaintiff.  Accordingly, defendant's motion for summary judgment on plaintiff's gender discrimination Title VII and the PHRA claims is granted.

### B.  Hostile Work Environment

The hostile work environment claim originates from Title VII, which makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  An actionable claim of a

sexually hostile work environment requires the plaintiff to demonstrate that the

"workplace is permeated with 'discriminatory intimidation, ridicule and insult," . . . that

is "sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment."   Harris v. Forklift Systems, 510 U.S. 17, 21

(1993).  Crucially, the plaintiff must show that her claim meets the above standard from

both subjective and objective perspectives:

> Conduct that is not severe or pervasive enough to create an
> objectively hostile or abusive work environment-an environment
> that a reasonable person would find hostile or abusive-is beyond
> Title VII's purview. Likewise, if the victim does not subjectively
> perceive the environment to be abusive, the conduct has not
> actually altered the conditions of the victim's employment, and
> there is no Title VII violation.

Id. at 21-22.

Although in her brief in opposition to summary judgment plaintiff asserts that

"there was a gender hostile, harassing atmosphere at Rapidigm," the claims set forth in

plaintiff's complaint do not include such a claim.  The court is satisfied that even had

plaintiff included such a claim in her complaint, clearly delineated it in her brief, and

marshaled all pertinent facts in its support, plaintiff still would have failed to state a

prima facie case under the undisputed facts of record and viewing all disputed facts in her

favor.

Among the facts plaintiff points to in the record are:  employees ignoring her

instructions, employees refusing to cooperate with her because she was female,

employees discouraging consultants from speaking with her because she was female,

Wheeler's and Sullivan's failure to follow-up on some of plaintiff's complaints about

22

discrimination, stray comments such as "Who do you think you are, the Queen?" from Amble,  Faurie's comments regarding "baring arms" and his lost opportunity in having rid his office of his couch, and the marketing department's "shark tank."  Even if these facts could establish  severe and pervasive harassment, or add up an objectively hostile or abusive environment, these facts do not add up to a subjectively hostile or abusive environment.  Plaintiff's actions at Rapidigm suggest that she is hardly hypersensitive. To the contrary, the record evidence demonstrates that plaintiff embraced a confrontational style and that she contributed to a considerable extent to an atmosphere in which sexual comments and blunt language were relatively commonplace.  She used words like "bitch" to describe herself in emails, mentioned the potential for a "lap dance" in public, placed a colleague's picture on an internet dating site, and sent explicit, obscene and shocking email correspondence of a sexual nature to colleagues within the company.  In short, plaintiff cannot begin to make out a prima facie hostile environment claim and there is no need to evaluate other required elements of this  claim.

### C.  Disparate Treatment

Plaintiff asserts that the record is "rife with discriminatory and disparate treatment" and, aside from the hostile environment-related facts addressed above, points to defendant's manner of handling her complaints of harassment or inappropriate male comments.  She alleges that her complaints were handled differently than complaints from males.

In order to establish a prima facie case of disparate treatment based on sex, plaintiff must demonstrate that she: (1) is a member of a protected class; (2) who suffered an adverse employment action; (3) under circumstances that give rise to an inference of

unlawful discrimination, such as might occur when a similarly situated person not of the protected class is more favorably treated.  Boykins v. Lucent Technologies, Inc., 78 F.Supp.2d 402, 409 (E.D. Pa. 2000) (citing Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)).

The unrefuted facts bear out that the handling of the complaints was independent of the gender of the complainer, and thus plaintiff failed to adduce sufficient evidence of the third prong of the prima facie case.  For example, Sullivan, a woman, did not investigate "the Queen" comment because she did not consider the comment sexist. With respect to Faurie's comments, made by a man, neither plaintiff nor anyone else thought the comments offensive, although Sullivan did talk to Faurie.  In contrast, when Sullivan learned of plaintiff's "lap dance" comment, Sullivan investigated and followed-up with a critical email to plaintiff, although Sullivan did not consider that email to be a serious action.  The circumstances of these complaints were different, and the complaints were differently treated.  As it stands plaintiff did not adduce sufficient evidence to prove a prima facie case with respect to disparate treatment and no reasonable trier of fact could render a verdict in her favor on this claim.

### D. Retaliation

In order to establish a prima facie case of retaliation, plaintiff must demonstrate that: (1) she engaged in protected activity; (2) her employer took adverse action after or contemporaneous with her protected activity; and (3) a causal link exists between her protected activity and the employer's adverse action.   Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 286 (3d Cir. 2001).  The first prong of the prima facie case requires, at the very least, an informal protest of discriminatory employment practices.

24

Barber v. CSX Dist. Services, 68 F.3d 694, 701-02 (3d Cir. 1995).  The protest, in whatever medium, must specifically relate to the protected conduct allegedly being infringed.  Barber, 68 F.3d at 701.  The term "adverse employment action" in the context of retaliation claims traditionally was understood to refer to a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits."  Weston v. Commonwealth of Pennsylvania, 251 F.3d 420, 430-31(3d Cir. 2001); see Pennsylvania State Police v. Suders, 542 U.S. 129 (2004)(holding that under Title VII, a hostile work environment/constructive discharge may serve for adverse action).  The United States Supreme Court, however, in Burlington Northern & Santa Fe Railway v. White, 126 S. Ct. 2405 (2006), interpreted the anti-retaliation provisions of Title VII not to be limited to the traditional employment-related actions listed above.  Id. at  2415.  In this case, there is no dispute that the alleged retaliatory action, plaintiff's termination, fits within even the traditional test for "adverse employment actions.

Defendant argues that the plaintiff cannot establish a prima facie case of retaliatory discharge because she can neither establish protected activity nor a causal connection between the protected activity and the discharge.  Additionally, defendant notes that plaintiff variously claimed as the "protected activity" the complaints she made about the two comments by Faurie at the end of September 2000 and Amble's "Queen" comment at the start of September 2000;  plaintiff in her brief claims both complaints as protected activity, and adds to the mix the totality of Amble's treatment of her.  She, however, nowhere makes the case that the poor treatment by Amble was "severe and pervasive" so as to implicate a retaliation claim under Title VII.  See Burlington Indus.,

Inc v. Ellerth, 524 U.S. 742, 752 (1998).(only harassing conduct that is "severe or pervasive" can produce a "constructive alteratio[n] in the terms or conditions of employment").

Neither does plaintiff make the causal connection between the protected activity and  the discharge.  With respect to the existence of a causal link between the plaintiff's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism.  Abramson, 260 F.3d at 288. ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").  Here, the nine-month gap between the last "protected activity" (Amble's "Queen" comment and Faurie's two comments) and plaintiff's discharge, appears too long to support by timing alone a causal connection between the actions in this retaliation claim.  The timing can be suggestive of a casual connection.  The farther the adverse employment action is from the protected activity, however, the more attenuated the connection becomes.  Here, a nine-month gap tends to weigh against any causal connection.  Plaintiff has not made an affirmative showing – for example, directing this court to particular instances – of ongoing antagonism during those intervening months.

Finally, even could plaintiff make a prima facie case of retaliation, which she has not, plaintiff did not adduce sufficient evidence for a reasonable trier of fact to conclude the employer's proffered reason for the discharge was pretextual as discussed above at §I. *A*. 3.  Ultimately, that is plaintiff's burden and having failed to adduce sufficient evidence from which a reasonable trier of fact could render a verdict in her favor on this

26

claim, the court must grant summary judgment in favor of defendant on this claim.

## II.  Wrongful Discharge / Public Policy

This case is now at an interesting posture.  Summary judgment will be granted in defendant's favor on all the federal claims raised in this case.  The sole remaining claim, a public policy exception to at-will employment, is firmly grounded in Pennsylvania law. Ordinarily, in a case such as this where the federal claims are disposed of on summary judgment, the district court should exercise its discretionary jurisdiction supplemental jurisdiction and "refrain from exercising jurisdiction [over the state law claims] in the absence of extraordinary circumstances."  Tully v. Mott Supermarkets, 540 F.2d 187, 195-96 (3d Cir. 1976).  Extraordinary circumstances which would warrant the exercise of jurisdiction include "considerations of judicial economy, convenience, and fairness to the parties."  Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995). (adopting dicta in  United Mine Workers v. Gibbs, 383 U.S. 715 (1966)).   Considerations of these special circumstances "make it reasonable and proper for the federal court to proceed beyond the federal question to final judgment once it has invested time and resources." New Rock Asset Partners v.  Pref'd Entity Adv.'s, 101 F.3d 1492, 1506 (3d Cir. 1996).

These extraordinary circumstances present themselves here.  This case was initiated five years ago, the parties have engaged in full discovery, the court has docketed hundreds of documents, and considerable amounts of money, time, and energy have been expended by the parties and the court.  To remove the state claim to a Pennsylvania court at this juncture strikes this court as unfair to the parties.  This court shall exercise its discretionary supplemental jurisdiction under 28 U.S.C. § 1367(c) and the decisions

discussed above and proceed to address this claim.

The general rule stands that an employer may discharge an at-will employee, such as plaintiff, for a good reason, a bad reason, or no reason at all.  Geary v. U.S Steel, 319 A. 2d 174 (Pa. 1974).  Of course, there are exceptions to this general rule, including statutory exceptions such as Title VII already discussed and public policy considerations.  A public policy restriction on an employer's power to fire an at-will employee without cause has been accepted in Pennsylvania.  Id.

Plaintiff asserts that her termination fits this exception.  She claims that her obligations as an attorney under the Rules of Professional Conduct adopted by the Pennsylvania Supreme Court implicate the Commonwealth's public policy.  Specifically, plaintiff argues that Pennsylvania public policy mandates that an attorney not engage or assist a client in fraudulent conduct and may disclose information to prevent or rectify the consequences of fraudulent acts.

This court in its exercise of diversity jurisdiction must apply the substantive law of Pennsylvania.  The Pennsylvania Supreme Court has not addressed the issue of whether the Rules of Professional Conduct are the public policy of the Commonwealth.  In the absence of a definitive ruling by a state's highest court, a district court must predict how the Pennsylvania Supreme Court would rule if faced with the issue.  Covington v. Continental General Tire, 381 F.3d 216 (3d Cir. 2004).  This court finds, as it did in a March 2003 Memorandum Opinion in this same case, that the Rules of Professional Conduct may implicate the public policy of the Commonwealth of Pennsylvania and will proceed on that premise.

28

Pennsylvania courts have acknowledged that "[i]n certain circumstances, a professional code of ethics may contain an expression of public policy."  Krajsa v. Keypunch, Inc., 622 A. 2d 355, 359 (Pa. Super. Ct. 1993); see Schick v. Shirey, 691 A. 2d 511, 516 (Pa. Super. Ct. 1997) (public policy not limited to that legislatively enacted); Yetter v. Ward Trucking, 585 A.2d 1022 (Pa. Super. Ct. 1991) (in some cases, professional code of ethics may contain expression of public policy).  The Pennsylvania Supreme Court has held that "[i]ntegrity and the exercise of good faith in an attorney's professional engagements are essential for the protection of the public, the courts, and the profession itself."  In re Leopold, 366 A.2d 227, 230 (Pa. 1976).  This court holds for the purpose of resolving the motion for summary judgment that if plaintiff was employed as an attorney, and was in fact discharged for acting in accordance with the Rules of Professional Conduct, that discharge may support a claim for wrongful termination or discharge under Pennsylvania law.

This analysis is informed by Fraser v. Nationwide Mut. Ins., 352 F.3d 107 (3d Cir. 2003) (public policy exception to at-will employment).  The court of appeals there confirmed the narrow limits of Pennsylvania's exceptions to at-will employment, holding that a whistle-blower plaintiff must demonstrate that she was fired for 1) refusing to engage in actual unlawful conduct or 2) acting in accordance with a legal duty to report the unlawful acts.  Id. at 112.  Plaintiff seeks to convince this court to ignore the binding law of Fraser in favor of an allegedly broader standard set forth in Shick v. Shirey, supra. Fraser controls here; the court of appeals specifically addressed Shick and Shick did not involve a public policy whistle-blower claim.   In the absence of an intervening Pennsylvania Supreme Court holding on point, this court may not disregard the court of

appeals' prediction with respect to how the Pennsylvania Supreme Court will rule.
<u>Covington</u>, 381 F.3d 216 at 221.

Plaintiff did not adduce sufficient evidence to demonstrate, as she must to survive summary judgment,  that she was fired for refusing to engage in <u>actual</u> unlawful conduct or that she was fired for acting in accordance with a <u>legal duty to report</u> the unlawful acts.   Although apparently Amble, plaintiff's direct supervisor, wanted plaintiff to sign petitions for five days while awaiting Tatalovich's hiring, the two top executives at Rapidigm, the president, Freudenberg, and the chief executive officer, Wheeler, told her explicitly that she need not sign anything that made her uncomfortable.  While these two statements may not in themselves be determinative that the plaintiff was never required to participate in actual unlawful conduct, plaintiff has never before, and does not now, claim that she was required to engage in actual unlawful conduct.

The record in this case shows that during her employment with defendant, plaintiff never did anything that she believed was unlawful or unethical, never signed any document knowing that the information therein was inaccurate, never engaged in fraud or anything unlawful, and had never reported any compliance issues to an outside entity.

If plaintiff were uncertain or suspicious about the conduct encouraged by defendant, even if those suspicions were reasonable, she still cannot show that the conduct rose to the level of actual unlawful conduct.  Suspicions and uncertainty about an employer's actions, even if reasonable, are insufficient as a matter of law to impose liability for an employee's discharge for reporting suspicions.  See <u>Clark v. Modern Group</u>, 9 F.3d 321 (3d Cir. 1993).  The employee plaintiff must show that the course of

30

action the employer wants the employee to take "actually violates the law," and "was indeed illegal." Id. at 323, 328.

Here, plaintiff would have to show that she was forced by defendant to violate the Rules of Professional Conduct.  Even when Amble directed plaintiff to sign petitions for five days in advance of Tatalovich's hire, plaintiff admitted that she merely speculated, and did not know, that the petitions were in fact inaccurate or that she would commit "fraud " or "perjury" by signing them.  She suspected wrongdoing at that time because Tatalovich was hired and because the company decided not to proceed with the homebasing program.  She, however, cannot point to evidence that any of the conduct was actually wrongful.

The record shows that plaintiff mentioned three times to defendant following her March 2000 announcement of full-compliance that, under certain circumstances she might have to report defendant to an outside entity.  Upon termination, plaintiff advised that "if I find out that any of my work has been used to perpetrate a fraud that I would have to report and that a lot of people could be involved in any kind of report that's made."  All of these comments, made to Amble, Sullivan, Kurth and Wheeler, were conditional upon finding out at some later point about violations of the law.  In fact, before termination, it could be inferred from the facts that plaintiff took some pains to insulate herself from the H-1B process and thus prevent herself from gaining actual knowledge of compliance violations.

In short, plaintiff has not demonstrated that she knew about actual unlawful conduct, let alone that she was fired for refusing to engage in actual unlawful conduct.

Her conditional threats to report were prospective and should be taken at face value, that she had not uncovered unlawful conduct. If plaintiff did not refuse to engage in unlawful conduct, then to survive summary judgment, she must demonstrate, under <u>Fraser</u>, that she was fired for acting in accordance with a legal duty to report the unlawful acts. She could not have been compelled to report suspicions she might have held in the absence of actual knowledge. Pennsylvania Rule of Professional Conduct 3.3[2] prohibits "knowingly" dishonest acts and Pennsylvania Rule of Professional Conduct 1.6[3] is permissive – a lawyer "may" reveal information reasonably necessary.

---

[2]

      Rules of Prof. Conduct, Rule 3.3, Candor Toward the Tribunal, 42 Pa.C.S., reads, in pertinent part (emphasis added):

> (a) A lawyer shall not <u>knowingly</u>:
> (1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
> (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction . . . ; or
> (3) offer evidence that the lawyer knows to be false. . . .

[3]

      Rules of Prof. Conduct, Rule 1.6. Confidentiality of Information, 42 Pa.C.S., reads in pertinent part (emphasis added):

> (a) A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent . . . .
> (b) A lawyer shall reveal such information if necessary to comply with the duties stated in Rule 3.3.
> (c) A lawyer <u>may reveal</u> such information to the extent that the lawyer reasonably believes necessary:
> * * *
> (3) to prevent, mitigate or rectify the consequences of a client's criminal or fraudulent act in the commission of which the lawyer's services are being or had been used. . . .

Plaintiff has not adduced sufficient evidence, as she must to survive summary judgment, that she was fired for refusing to engage in actual unlawful conduct or that she was fired for acting in accordance with a legal duty to report the unlawful acts.  For the purpose of deciding the motion for summary judgment, it is unnecessary to evaluate whether those things to which plaintiff was exposed might have triggered a mandatory duty to report defendant to a governmental authority.  The undisputed fact is that plaintiff, by her own admissions, did not know of any unlawful conduct at the time of her discharge.  It is worth noting for completeness that even could plaintiff show on a prima facie basis that she was fired for refusing to engage in actual unlawful conduct or that she was fired for acting in accordance with a legal duty to report the unlawful acts, defendant could still refute this evidence with a legitimate nondiscriminatory reasons for her discharge.

Because plaintiff did not adduce sufficient evidence to prove that she was fired either for refusing to engage in actual unlawful conduct, for example, by an actual violation of the Rules of Professional Conduct, or that she was fired for acting in accordance with a legal duty to report the unlawful acts, this court concludes that no reasonable trier of fact could render a verdict for plaintiff on this claim.  Summary judgment in favor of defendant must be granted on this claim.

### Conclusion

AND NOW, this 29th day of March, 2007, upon consideration of the motion for summary judgment filed by defendant Rapidigm, Inc., **IT IS ORDERED** that

defendant's motion for summary judgment (Doc. No. 202)  is **GRANTED.**

The clerk shall mark this case closed.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge


cc: Counsel of Record